IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> TYRONE K. DAVIS, ) <br> ) <br> Defendant. ) <br> _____) | Criminal Action No. 12-cr-70 (GMS) |

## MEMORANDUM OPINION

### I. INTRODUCTION

On September 23, 2012, the Grand Jury for the District of Delaware returned a one-count Indictment charging the defendant, Tyrone K. Davis ("Davis"), with possession and transportation of a firearm by a prohibited person in violation of Title 18, United States Code, Sections 992(g)(1) and 924(a)(2). Presently before the court is Davis' Motion to Suppress Evidence. (D.I. 14.) The court held an evidentiary hearing in connection with this Motion (D.I. 16) and subsequently directed the parties to file proposed Findings of Fact and Conclusions of Law. After having considered the testimony elicited during the hearing and the arguments presented in the parties' submissions on the issues, the court will deny Davis' motion.

### II. FINDINGS OF FACT

At the evidentiary hearing, the United States called two witnesses: William Browne ("Captain Browne"), Captain of Detectives for the Wilmington Police Department ("WPD") and leader of the WPD's Crisis Management and Tactical Team ("SWAT Team"); and Kimberly Pfaff ("Detective Pfaff"), a criminal investigator for the WPD. *See* Transcript of Evidentiary Hearing ("Tr.") (D.I. 16) at 5:4-15; *id.* at 31:3-13. After listening to the testimony of the witnesses, the

court concludes that Capital Browne and Detective Pfaff's account of the facts is credible. The following represents the court's essential findings of fact as required by Rule 12(d) of the Federal Rules of Criminal Procedure.

On August 16, 2012, Detective Pfaff applied for and obtained a warrant for the body of Davis ("arrest warrant") at 512 N. Monroe Street, Wilmington, Delaware, based upon a reasonable belief that Davis would be located therein.[1] (D.I. 21 at 2 (citing Tr. at 32:3-7).) Detective Pfaff applied for the arrest warrant after receiving a call regarding a domestic violence complaint from Davis' ex-girlfriend. (*Id.* (citing Tr. at 32:3-7).) On August 15, 2012, Davis' ex-girlfriend, referred to throughout the briefing as "I.B.", called 911 after a physical altercation took place between her and Davis on the 500 block of Monroe Street and reported the incidents to the WPD. (*Id.* at 3 (citing Tr. at 32:10-18).) Specifically, on that date, pursuant to the affidavit of probable cause in support of the arrest warrant, Wilmington police officers responded to the area of West Ninth and Monroe Streets in reference to the assault and, upon arrival, made contact with I.B., who told the officers that Davis ran up to her at a location on the 500 block of North Monroe Street, followed her inside the residence, pulled her hair, punched her in the face with a closed fist and, ultimately, pulled her out of the residence, causing her to stumble down the front steps. (*Id.* (citing Gov't Ex. 2; Tr. at 32:12-14).) I.B. also informed the officers that, on August 13 and August 14, 2012, Davis attacked her by slapping her, pulling her hair, and threatening her. (*Id.* (citing Tr. at 32:14-18).)

On this information, Detective Pfaff applied for the arrest warrant in connection with Davis' alleged violation of Delaware Criminal Code, Title 11, Section 611, Assault Third Degree. (D.I. 20 at 2.) Although the WPD considered Davis a person of interest in an ongoing homicide investigation at the time Detective Pfaff sought the arrest warrant, the application did not include

---

[1] Davis appeared in court for a capeas proceeding on August 16, 2012 and advised the court at that time that his home address was 512 Monroe Street, Wilmington, Delaware.

2

any information to this affect. (*Id.*) The arrest warrant application did not specify whether officers anticipated that Davis would be armed or if he possessed a firearm during the alleged assaults. (*Id.*)

Detective Pfaff testified that, as part of their preparation to execute the arrest warrant, the WPD officers made the determination that they would use the assistance of the WPD SWAT Team. (D.I. 21 at 3 (citing Tr. at 34:15-21).) The WPD's SWAT Team is often utilized in executing "high risk warrants"—specifically, warrants where the subject has a violent criminal history and/or a history of utilizing weapons. (*Id.* at 3-4 (citing Tr. at 34:15-21; *id.* at 6:2-8).) Detective Pfaff testified that she communicated her findings regarding Davis' history of violence to her supervisor, who then, in turn, communicated those findings to Captain Browne, the officer in charge of the SWAT Team at the time of Davis' arrest. (*Id.* at 4 (citing Tr. at 36:8-16).)

Shortly thereafter, Detective Pfaff contacted Captain Browne and discussed apprehension of Davis. (*Id.* (citing Tr. at 7:4-13).) Detective Pfaff gave Captain Browne the location of the arrest warrant, 512 North Monroe Street, and, noted that, in addition to being wanted for domestic assault, Davis was a person of interest in a homicide investigation. (*Id.* (citing Tr. at 7:10-12).) Detective Pfaff further informed Captain Browne that the weapon used in the homicide had not been recovered. (*Id.* (citing Tr. at 7:15-16).) Captain Browne reviewed Davis' criminal history in the days leading to the execution of the arrest warrant and determined, along with the SWAT Team, that the warrant would be classified as "high-risk." (*Id.* (citing Tr. at 10:21-24).) Captain Browne testified that this determination was informed by certain aspects of Davis' criminal history—specifically, that Davis was a convicted felon with a history of resisting arrest and assaults on police officers. (*Id.* (citing Tr. at 12:21-25).) Captain Browne testified that Davis'

3

convictions were of the type that would cause concern for both himself and members of the SWAT Team executing a warrant. (*Id.* (citing Tr. at 13:2-7).)

Specifically, the following criminal history items were relevant in this determination: (1) on August 1, 2003, Davis was arrested for resisting arrest and criminal trespassing; (2) on August 6, 2003, Davis was arrested for carrying a concealed and deadly weapon and possession of a deadly weapon by a prohibited person; (3) on June 6, 2004, Davis was arrested for aggravated menacing, menacing, and resisting arrest; (4) on November 19, 2004, Davis pled guilty to first degree assault, second degree assault, and possession of a weapon by a prohibited person, after which he was sentenced to a five year term of incarceration; (5) Davis' conviction for carrying a concealed and dangerous instrument on December 19, 2005; (6) on March 31, 2010, Davis was arrested for resisting arrest; (7) on October 10, 2011, Davis was arrested for possession of a firearm by a prohibited person, possession of a firearm during the commission of a felony, reckless endangering, and attempted assault; and (8) on February 23, 2012, Davis was arrested for resisting and hindering a police officer and this charge remained pending at the time the arrest warrant was executed.[2] (*Id.* at 4-5 (citation omitted).)

Having characterized the Davis arrest warrant as "high-risk," the SWAT Team devised an entry plan for its execution and determined that they would establish a containment perimeter with nearby police units. (*Id.* at 5 (citing Tr. at 13:23-25).) At approximately 6:00 a.m., the SWAT Team, upon exiting their vehicles and approaching house, first checked to see if the front door was unlocked. (*Id.* (citing Tr. at 14:7-8).) The SWAT Team found the door unlocked, entered the

---

[2] Davis lists his criminal history record as including the following: (1) misdemeanors—carrying a concealed weapon (2004), loitering (2004), criminal trespass (2004), criminal impersonation (2011), and resisting arrest (2011); and (2) felonies—assault first, assault second, and possession of a weapon by a prohibited person (same incident, 2004), and possession with the intent to deliver marijuana (2010). (D.I. 20 at 2.) Davis' Opening Brief also notes that he was charged with a shooting incident in 2011, but that that charged was dismissed. (*Id.*)

4

residence, and, as soon as they crossed the front door threshold, announced their presence, yelling "Police! We have a search warrant!" (*Id.* (citing Tr. at 15:1-4, 7-15).) Captain Browne testified that it is the SWAT Team's practice to have multiple members make continuous announcements as they move throughout the residence so that the occupants know who they are and why they are there. (*Id.* (citing Tr. at 15:4-6).)

As Captain Browne entered the living room of the residence, he noticed a subject, later identified as Davis, laying on the floor apparently sleeping. (*Id.* at 6 (citing Tr. at 16:5-7).) Captain Browne commanded Davis to put his hands behind his back so that he could secure him, and placed Davis in handcuffs. (*Id.* (citing Tr. at 16:7-9).) Despite being cuffed, Davis did not remain still and began to roll over to his left in such a way that Captain Browne began to lose sight of his hands. (*Id.* (citing Tr. at 16:13-15).) Captain Browne ordered Davis not to move and leaned down to secure him, placing Davis face-down so that he could "maintain control of him for officer safety reasons." (*Id.* at (citing Tr. at 16:11-17).) As Captain Browne leaned down to secure Davis, he noticed a .38-caliber revolver underneath the coffee table, approximately twelve inches from Davis. (*Id.* (citing Tr. at 16:18-24).) Captain Browne announced that there was a weapon in the room and reestablished control of Davis, moving him away from the firearm. (*Id.* (citing Tr. at 17:6-7, 18:17-18).)

Detective Pfaff and the WPD Criminal Investigation Team entered the residence upon being advised by the SWAT Team that it was safe to do so and Captain Browne informed Detective Pfaff that the SWAT Team had located the firearm next to Davis. (*Id.* (citing Tr. at 37:5-9, 14-16).) The WPD investigators performed a protective sweep of the residence. (*Id.* (citing Tr. at 18:19-9-19:6).) Detective Pfaff observed the firearm and then left to obtain a search warrant for the residence. (*Id.* at 7 (citing Tr. at 37:15-16, 38:3-9).) Detective Pfaff testified that she believed

5

she needed to obtain a search warrant because the original warrant was limited to a search for Davis' body and, therefore, the WPD would need a new warrant to search the house. (*Id.* (citing Tr. at 38:13-17).) Officers conducted a search of the residence when Detective Pfaff returned with the warrant, but did not uncover any additional weapons or ammunition. (*Id.* (citing Tr. at 38:23-24).) The only other item seized as a result of the search warrant was Davis' cell phone. (D.I. 20 at 3.) Davis was then taken back to the WPD headquarters, where he gave a post-*Miranda* statement admitting to possession of the firearm and noted that he purchased it for $150 from an unidentified male in Philadelphia because he believed his life was in danger. (D.I. 21 at 6 (citing D.I. 2 at ¶ 8).)

## III. CONCLUSIONS OF LAW

Davis asserts that the evidence obtained as a result of the above-described arrest must be suppressed as the product of an unreasonable search and seizure in violation of the Fourth Amendment. (D.I. 14; D.I. 15; D.I. 23.) Specifically, Davis contends that: (1) his prior "criminal history, by itself, did not create a sufficient threat for police to disregard the constitutionally imposed requirement to knock and announce their presence before entering a home on an arrest warrant" (D.I. 20 at 3); (2) "the circumstances of the case" did not "justify the police's failure to knock and announce" (*id.*); and (3) the exclusionary rule should apply in this case because the police entered the home unlawfully and the evidence seized would not have been found "but for" the unlawful entry (*id.*). In support of his position, Davis notes that Detective Pfaff admitted in her testimony that she obtained the warrant for his body hoping that the WPD would find the handgun used in the unsolved homicide while officers were inside the residence.[3] (*Id.* at 11-12.)

---

[3] Specifically, Detective Pfaff testified:
Q: Yes. Is the fact that you really didn't have anything on Mr. Davis the reason why you didn't apply for a search warrant of the residence at 512 Monroe Street to look for the gun [allegedly used in the homicide] after you knew that he was residing there on August the 13th?

6

Conversely, the government argues that the firearm should be admitted because: (1) per *Michigan v. Hudson*, suppression is not a remedy available to Davis for an alleged violation of the knock and announce rule (D.I. 21 at 7 (citing 547 U.S. 586 (2006))); (2) even if Davis were entitled to suppression, which he is not, his claim would still fail because the WPD's decision to forego compliance with the knock and announce rule was reasonable due to the known and articulable danger that he posed to law enforcement (*id.* at 10-13); and (3) the law enforcement officers here executed the search in good faith reliance on the search warrant's authority and on the state of the law in Delaware, rendering the exclusionary rule inapplicable (*id.* at 13-14).

## A. Whether Suppression is an Available Remedy to a Knock and Announce Rule Violation

The Fourth Amendment protects the rights of individuals to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To this end, it is well established that law enforcement officers must possess a warrant before conducting a search and/or seizure, unless the warrantless search falls within one of the "few . . . and carefully delineated" exceptions to the warrant requirement. *United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984)). Here, the parties do not dispute that the WPD possessed a warrant for the body of Davis.

---

A: Correct. I had no probable cause.
Q: But you did, subsequent to talking to the victim, the alleged victim, on the 15th of August, have probable cause to get him arrested for the assault. Right?
A: That's correct.
Q: Were you hopeful that in arresting Mr. Davis for the assault that you would find something related to this homicide investigation?
A: I guess there is always a chance of hope. But my primary investigation at that time was for the domestic assault.
Q: Let me ask it another way. Was this a strategy that you employed essentially to get inside the home of Mr. Davis to—where you knew you weren't going to get a search warrant because you didn't have probable cause to search the home, was this a strategy that you used to get a warrant for the body, to get into the home?
. . . .
A: Yes, it was an investigative tool I used.
Tr. at 40:22-41:23.

7

The Supreme Court has also afforded Fourth Amendment protection to knock and announce entries. *See Wilson v. Arkansas*, 514 U.S. 927, 931 (1995). Specifically, the Court has noted that there is "no doubt that the reasonableness of a search of a dwelling may depend in part on whether the law enforcement officers announce their presence and authority prior to entering." *Id.* In *Wilson v. Arkansas*, the Court explained that this common law principle of announcing an officer's presence is "embedded in Anglo-American law" and, further, that adherence to this principle is an element of the reasonableness required under a Fourth Amendment analysis. *See id.* at 933-34.

Importantly, however, the knock and announce rule is not absolute. Indeed, in *Wilson*, the Court recognized that police officers may have "reasonably believed that a prior announcement would have placed them in peril, given their knowledge" of the petitioner's criminal history, which included threatening a government informant with a semi-automatic weapon and convictions for arson and fire-bombing. *See id.* at 936. The Court has also identified additional exceptions to the knock and announce rule, including situations in which: (1) the individual inside was aware of the officers' identify and, therefore, the announcement would have been a useless gesture; (2) the announcement might lead to the sought individual's escape; (3) the announcement might place the officers in physical peril; and (4) adherence to the rule might lead to the destruction of evidence. *See Richards v. Wisconsin*, 520 U.S. 385, 394 (1997). In so holding, the Court recognized that "the Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests." *See id.*

The Court later extended this rationale in *Michigan v. Hudson*, where it held that the exclusionary rule did not apply to the facts presented and suppression was not an available remedy for a knock and announce rule violation. Specifically, the Court in *Hudson* concluded that the

exclusionary rule was not available because: (1) the knock and announce rule violation did not require suppression of all evidence found in the search; (2) the illegal manner of entry was not the but for cause of obtaining the evidence[4]; (3) the interests that were violated, "preventing the government from seeing or taking evidence described in the warrant," had "nothing to do with the seizure of evidence"[5]; and (4) "the social costs of applying the exclusionary rule" to knock and announce violations are "considerable[,] the incentive to such violations were minimal to begin with[,] and the extant deterrences against them are substantial."[6]

In light of this stated rationale, Davis argues that the exclusionary rule should apply in this case because the WPD's failure to adhere to the knock and announce rule was, in fact, the "but for" cause of Captain Browne finding the firearm at issue. Specifically, Davis asserts that, had the WPD SWAT Team knocked and announced its presence as constitutionally required, he would have answered and been arrested at the front door and, therefore, Captain Browne would not have entered the premises and observed the firearm under the table. (D.I. 20 at 12.) Davis further adds that, because he would have answered the front door, the gun would not have been in plain view and the WPD officers "would not have gained any additional information to support a search warrant on the premises," confirming that the firearm would not have been found. (*Id.*)

Davis asserts that the evidence at issue should be excluded because the *Hudson* Court, in arriving at its decision, considered whether the violation was the "but for" cause of the officers finding the evidence in that case. Thus, Davis maintains that, "unlike the defendant in *Hudson*, [he] can claim that 'but-for' the police's failure to knock and announce, the police would not have found or seized the firearm evidence," necessitating suppression here. (*Id.* at 14.) As additional

---

[4] *Hudson*, 547 U.S. at 591.
[5] *Id.* at 594.
[6] *Id.* at 599.

9

support for this argument, Davis notes that the Court's decision in *Wong Sun v. United States* positioned the but for test as a key consideration in assessing whether suppression is warranted. (*Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).) Applying this test to the instant matter, Davis argues that "the evidence was gathered solely through the exploitation of the failure to knock and announce and there is no other basis for the retrieval of the evidence that distinguishes it from the 'primary taint.'" (*Id.*)

The court disagrees with Davis' characterization of the *Hudson* holding as well as with his conclusion that Fourth Amendment jurisprudence dictates suppression. Specifically, it appears clear to the court that *Hudson*'s holding is not limited to circumstances where the discovery of evidence was not the but for result of the knock and announce rule violation. Indeed, the language in *Hudson* makes this point clear:

> [E]xclusion may not be premised on the mere fact that a constitutional violation was a "but-for" cause of obtaining evidence. Our cases show that but-for causality is only a necessary, not sufficient, condition for suppression. . . . But even if the illegal entry here could be characterized as a but-for cause of discovering what was inside, we have "never held that evidence is 'fruit of the poisonous tree' simply because 'it would not have come to light but for the illegal actions of the police'". . . . Even in the early days of the exclusionary rule, we declined to hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light *but for* the illegal actions of the police.

*Hudson*, 547 U.S. at 592 (citations omitted) (emphasis in original). The *Hudson* Court further explained that the exclusionary rule does not apply where "the link between the illegality and th[e] evidence [i]s sufficiently attenuated to dissipate the taint, including when the casual connection is too remote" or when the "interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Hudson*, 547 at 592-93 (citing *Segura v. United States*, 468 U.S. 796, 815 (1984)).

Clarifying the "interest protected" by the knock and announce rule, the Court noted that such interests include "protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident," "protection of property," and, generally, "elements of privacy and dignity that can be destroyed by a sudden entrance." *See id.* at 592. With regard to the last interest, the knock and announce rule "gives residents the 'opportunity to prepare themselves for' the entry of the police'" and provides a "brief interlude between announcement and entry with a warrant" so that "an individual [can] pull on clothes and get out of bed." *See id.* (citation omitted). Importantly, however, the interests protected by this rule "do not include the shielding of potential evidence from the government's eyes." *Id.* at 593. Thus, and as the Court distinguished in *Hudson*, where "the interests that were violated . . . have nothing to do with the seizure of evidence, the exclusionary rule is inapplicable." *Id.* at 594.

In light of this rationale, the court is unpersuaded by Davis' argument that the *Hudson* Court based its decision on a but for analysis. In fact, Davis does not cite to any support, aside from providing an interpretation of *Hudson*, directly supporting his position that the evidence should be excluded as fruit of the poisonous tree, despite the absence of a suppression-triggering rule violation. Moreover, the Third Circuit has likewise rejected Davis' reading of *Hudson*. *See United States v. Briggs*, 347 Fed. Appx. 750, 753 (3d Cir. Oct. 1, 2009) (non-precedential) (citing *Hudson* in stating that suppression would not be appropriate even if law enforcement had violated the knock and announce rule when executing a search warrant); *United States v. Stalling*, 275 Fed. Appx. 147, 149 (3d Cir. Apr. 23, 2008) (non-precedential) (finding that the *Hudson* decision renders the argument that a defendant is entitled to suppression for a violation of the knock and announce rule to be meritless); *see also United States v. Mosely*, 454 F.3d 249, 259 n.15 (3d Cir. 2006) (observing that when the "illegality is restricted to a violation of the knock and announce

11

rule . . . no one, not even the owner, can suppress"); *United States v. Jones*, 523 F.3d 31, 36 (1st Cir. 2008) (applying *Hudson* to no-knock executions of arrest warrants).

In consideration of the foregoing, the court concludes that the knock and announce rule violation in this case does not warrant application of the exclusionary rule because, as the *Hudson* Court detailed, the violation here "ha[s] nothing to do with the seizure of evidence," suppression would not further the interests protected by the knock and announce rule, and the *Hudson* decision did not turn on the but for analysis Davis advances. *See generally Hudson*, 547 U.S. at 592-94.

### B. Validity of the WPD's Decision to Forego Adherence to the Knock and Announce Rule Based on Davis' Criminal History

Davis also contends that, if he is entitled to suppression for violation of the knock and announce rule, the evidence in question should be suppressed because: his criminal history, by itself, did not create a sufficient threat for police to disregard the knock and announce rule and/or characterize the execution of his arrest warrant as "high risk"; and the circumstances in this case, aside from his criminal record, did not independently justify a no-knock entry. (D.I. 20 at 3, 10.) Assuming that the exclusionary rule could apply to a no-knock search to suppress evidence obtained, the court disagrees with both of Davis' assertions.

First, it is well established that the Fourth Amendment does not impose a specific rule governing no-knock entries, but, instead, imposes a general requirement of "reasonableness," which is "informed by the goals of preventing undue invasion of privacy and destruction of private property." *See United States v. Stiver*, 9 F.3d 298, 302 (3d Cir. 1993). To this end, the Fourth Amendment contains a flexible requirement that all searches and seizures be "reasonable" and regards an officer's failure to announce his or her presence before entering a residence to carry out an otherwise lawful search or seizure as a factor in assessing whether that reasonableness requirement is met in a given scenario. *See Bodine v. Warwick*, 72 F.3d 393, 398 (3d Cir. 1995).

As the Supreme Court explained in *Richards v. Wisconsin*, to "justify a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence under the particular circumstances would be dangerous or futile." *Richards*, 520 U.S. at 394. Thus, circumstances supporting reasonable grounds for an officer to expect futility or exigency upon knocking, is deemed a constitutionally permissible entry, despite lack of adherence to the rule. *See United States v. Banks*, 540 U.S. 31, 36-37 (2003).

In assessing reasonableness, a court is tasked with assessing the totality of the circumstances surrounding the execution of the arrest warrant. Here, the court concludes that the officers' decision to execute the warrant without adhering to the knock and announce rule and their conduct during the execution of the warrant were both reasonable. As detailed in the Findings of Fact section above, Captain Browne and the SWAT Team engaged in a risk assessment of Davis before determining whether to execute the warrant without knocking and announcing their presence. In this assessment, the officers reviewed Davis' criminal history, which detailed that he is a convicted violent felon with a history of assaults, resisting arrest, assaults on police officers, and possession of a deadly weapon by a person prohibited. In addition to reviewing this information, the officers also took into account, based on information provided by Detective Pfaff, that Davis had allegedly assaulted I.B., which provided grounds to believe that Davis was prone to violence or, at very least, easily provoked. Further, Davis was a suspect in an ongoing homicide investigation and the firearm used in that homicide had not yet been recovered. The court finds that the officers, considering these items in combination, could reasonably believe that Davis would be aggressive toward the officers, violent, or armed, making the execution of the arrest warrant potentially dangerous.[7] Therefore, the court finds the officers' determination to execute

---

[7] The court rejects Davis' assertion that the officers' safety concerns were "premised mainly," if not entirely, on his criminal history or that evaluation of his criminal history in assessing whether a warrant was high-risk would

13

the search warrant without knocking and announcing their presence prior to entering was likewise reasonable and justified based on the totality of the circumstances presented here.

Second, the court finds that, contrary to Davis' assertion, the SWAT Team members who entered the house during execution of the warrant acted reasonably. Specifically, before entering the residence, the officers checked the door to see if it was unlocked and found that it was. Next, when they entered the residence, multiple Team members announced their presence by yelling "Police! We have a search warrant!" while moving through the home, which mitigated the intrusiveness of the knock and announce violation. Finally, once Davis was secured and the firearm was observed, the SWAT Team waited to obtain a search warrant before searching the residence.

The court notes that, in reaching its conclusion that the SWAT Team acted reasonably, it rejects Davis' assertion that the "subjective intent" of the officers involved necessitates suppression. Davis argues that the WPD "circumvented the search warrant process by getting an arrest warrant on a minor case" and "using his prior arrest record as a basis to enter his home with [sic] knocking." (D.I. 20 at 15.) In support, Davis references Detective Pfaff's acknowledgement during the evidentiary hearing that she "hope[d]" to find the firearm from the unsolved homicide upon entering the residence and that the arrest warrant could be used as an "investigative tool." (*Id.*) Importantly, however, Davis' argument is undermined by the fact that the arrest warrant was lawfully obtained. Indeed, Davis cites to no case law indicating that an officer being hopeful of finding evidence of criminal activity when that officer has a lawful right to enter a residence pursuant to a valid warrant, would render that warrant or the entrance illegal.

---

be unreasonable or inappropriate. Therefore, the court does not need to reach and does not assess Davis' contention that reliance on criminal history alone in determining a no-knock warrant execution would, contrary to the Supreme Court's guidance in *Richards v. Wisconsin*, inappropriately create a "blanket exception" that would render the rule meaningless. (D.I. 20 at 5-6.)

Rather, it is clear that, when assessing the particular circumstances of a case, courts are tasked with applying an objective standard of reasonableness. *See Whren v. United States*, 517 U.S. 806, 813 (1996). Thus, the subjective intentions or motivations of Detective Pfaff are irrelevant. *Id.* (noting that the Court has consistently held that an officer's motives will not invalidate objectively justifiable behavior under the Fourth Amendment). Thus, because the officers had an objectively reasonable basis to arrest Davis and the arrest warrant for his body was based on the alleged assault I.B., the court finds that Detective Pfaff's subjective reason(s) and/or motivation(s) for obtaining the warrant are of no consequence in the reasonableness determination. Detective Pfaff's hope of finding evidence from the unsolved homicide when arresting Davis pursuant to the valid arrest warrant does not render that arrest or the seizure of evidence illegal.

In view of the foregoing, the court finds that the officers had: an objective, reasonable basis for believing that execution of the arrest warrant to be high-risk; and acted reasonably in executing the warrant without adhering to the knock and announce rule.

### C. The Validity of the Officers' Reliance on the Arrest Warrant's Authority

Finally, the court finds that, even if the officers' decision to forego adherence to the knock and announce rule and their actions were unreasonable—which the court has concluded they were not—the officers' good faith reliance on a valid search warrant rendered Davis' arrest and the seizure of the firearm valid. In *United States v. Leon*, the Court created an exception to the exclusionary rule, which instructs that, under the good faith exception, "suppression of evidence is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." *United States v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001) (citation omitted); *see generally United States v. Leon*, 468 U.S. 897 (1984). Indeed, the mere existence of a warrant typically justifies application of the exception. *See Hodge*, 246 F.3d at 307-08. Here, Davis, as

his counsel explained during the evidentiary hearing, does not contest that the arrest warrant in this case was, in fact, valid.[8] *See* Tr. at 3:23-4:8. The court likewise agrees that it was a valid warrant for an assault-related arrest. Thus, because the officers here relied upon the valid arrest warrant in entering Davis' residence and upon the valid search warrant when searching the residence, Davis' motion is likewise denied under the good faith doctrine as it relates to reliance on a valid warrant.[9]

## IV. CONCLUSION

For the foregoing reasons, the court hereby denies the defendant's motion to suppress.

Dated: July 30, 2013

CHIEF, UNITED STATES DISTRICT JUDGE

---

[8] Specifically, the court engaged in the following discussion with Davis' counsel at the outset of the evidentiary hearing:
> Court: [I]t is your contention, Mr. Brose, that [the SWAT Team] entered on the authority, actually constitutionality, of the arrest warrant. And the search warrant, as I understood from our last teleconference, is really not at issue?
> Davis' Counsel, Mr. Brose: It is not at issue, Your Honor. . . . There may be issues related to the probable cause underneath the initial search warrant [for the body of Davis] that are factually related to our argument. But it's not going to be related to a claim that the warrant itself was issued unconstitutionally.
> Court: You are not contesting the four corners of the warrant.
> Mr. Brose: Correct.

Tr. at 3:13-4:8.

[9] The court notes that Davis also argues in his briefing that the officers in this case did not obtain a "no-knock warrant," and that this failure should impact the court's analysis because the decision to execute a warrant without knocking and announcing should be determined by a neutral magistrate. (D.I. 20 at 7.) However, under Delaware law, there is no statute authorizing the issuance of a no-knock warrant by a magistrate judge. *State of Delaware v. Backus*, 2002 Del. Super. LEXIS 484, No. 0106010649, at *13 (Del. Super. Nov. 18, 2002). Thus, it is clear to the court that the decision of whether to knock when executing a warrant is left to the discretion of the officers. Captain Browne detailed the same understanding in his testimony. *See* Tr. at 20:15-21:1. Consequently, the court disagrees with Davis that the WPD officers' failure to obtain a no-knock warrant should be considered and/or should impact the analysis. *See, e.g., United States v. Davis*, 131 S. Ct. 2428, 2429 (2011) (noting that "responsible law-enforcement officers will take care to learn what is required of them under Fourth Amendment precedent and will conform their conduct to these rules" and concluding that officers can rely in good faith on prior judicial precedent).

16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Criminal Action No. 12-cr-70 (GMS) |
| ) | |
| TYRONE K. DAVIS, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## **ORDER**

For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY ORDERED THAT:

1. The defendant's Motion to Suppress Evidence (D.I. 14) is DENIED.

Dated: July 30, 2013

CHIEF, UNITED STATES DISTRICT JUDGE